# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF INDIANA
### INDIANAPOLIS DIVISION

|  |  |  |
|---|---|---|
| MICHAEL W. PATTON, | ) | |
|  | ) | |
|     Plaintiff, | ) | |
|  | ) | |
|     v. | ) | |
|  | ) | Case No. 1:12-cv-00135-TWP-DML |
| MICHAEL J. ASTRUE, | ) | |
| COMMISSIONER OF THE SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
|  | ) | |
|     Defendant. | ) | |

## ENTRY ON JUDICIAL REVIEW

Plaintiff, Michael W. Patton ("Mr. Patton"), requests judicial review of the final decision of Michael J. Astrue, the Commissioner of Social Security Administration (the "Commissioner"), denying Mr. Patton's request for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act. For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I.  BACKGROUND

Mr. Patton was born on December 30, 1964 and is married with two step-children. R. at 56, 299. He completed the 12th grade and has a GED. R. at 446. Mr. Patton previously worked for General Electric and was also a general contractor and self-employed welder. R. at 78-79, 440. He quit his job at General Electric "because of all the restrictions" and finally had to stop his self-employed work as a contractor because of his medical conditions. R. at 446. Mr. Patton was forty years old at the onset of his disability. R. at 440.

**A.**     **Procedural History**

Mr. Patton filed an application for DIB on May 14 2007, alleging an onset disability date of March 1, 2005, due to pain and stress.  R. at 299, 401.  The Commissioner denied Mr. Patton's application initially and again on reconsideration.  R. at 109, 113-14.  Upon Mr. Patton's request, an administrative law judge, The Honorable James R. Norris (the "ALJ"), conducted a *de novo* Administrative Hearing (the "Hearing") on September 23, 2009, and held subsequent supplemental hearings on February 3, 2010 (the "Second Hearing"), and July 7, 2010 (the "Third Hearing"); Mr. Patton was represented by counsel at all times.  R. at 37, 78, 102, 119.  The ALJ issued an opinion on July 21, 2010, holding that Mr. Patton is not disabled pursuant to the Social Security Act, §§216(i), 223(d), and is not entitled to DIB.  R. at 15-16, 29.  The Appeals Council denied Mr. Patton's Request for Review on November 29, 2011, and again on December 19, 2011.  R. at 1-10.  On January 27, 2012, Mr. Patton filed a Complaint with this Court, seeking judicial review of the Commissioner's decision on the basis that it is not supported by substantial evidence.  Dkt. 1.

**B.**     **Medical History**

Dr. Robert C. Beesley ("Dr. Beesley") is Mr. Patton's family physician, and he specializes in internal medicine.   At various times between 2004 and 2007, Dr. Beesley evaluated Mr. Patton for conditions such as high blood pressure, anxiety/depression, back and leg pain, and gastroesophageal reflux disease, and he prescribed various medications for his blood pressure and back and leg pain.  R. at 392-400.

On June 6, 2007, Dr. Albert H. Fink ("Dr. Fink"), a licensed psychologist and consultant for the Disability Determination Bureau, conducted a mental status evaluation of Mr. Patton.  R. at 401.  Dr. Fink reviewed Mr. Patton's habits of tobacco use (both smoking and chewing), as

well as his heavy alcohol consumption, to which Mr. Patton stated that he was drinking approximately eighteen beers per day in order to deal with his pain. *Id.* Dr. Fink observed that Mr. Patton was friendly and cooperative, maintained eye contact, had a neat appearance, and was sunburned. R. at 402. Although Dr. Fink noted no abnormalities with Mr. Patton's gait or coordination, he remarked that Mr. Patton was unable to sit comfortably, appeared pained as he adjusted his position, and was wearing a brace below his left elbow. *Id.* Dr. Fink found Mr. Patton's memory intact based on his ability to recall numbers and remember details of daily life, and he was able to calculate basic arithmetic problems. *Id.* Mr. Patton responded adequately to judgment and insight questions, was alert and fully oriented, and exhibited a positive mood. *Id.* Dr. Fink concluded that Mr. Patton's cognitive and social skills were within normal limits, he portrayed no psychotic symptoms, and although Mr. Patton was experiencing mood swings and severe financial, medical, and familial stressors, no mental health professional was providing treatment for Mr. Patton. *Id.* Mr. Patton informed Dr. Fink of his poor appetite and difficulties sleeping, and explained that he is no longer able to mow or weed his lawn, golf, or ride his motorbike. *Id.* Overall, Dr. Fink concluded Mr. Patton's symptoms do not significantly impede his abilities, and, based on Mr. Patton's cognitive and affective—not physical—limitations, Dr. Fink opined that Mr. Patton is capable of "functioning in typical work environment and social settings" and assessed a Global Assessment Functioning ("GAF") score of 65. R. at 403.

On June 19, 2007, Dr. William A. Shipley ("Dr. Shipley"), a clinical psychologist and consultant for the Disability Determination Bureau, conducted a psychiatric review of the medical record. R. at 404. Dr. Shipley opined that Mr. Patton has non-severe anxiety and substance addiction (Listing 12.06) impairments, which are accompanied by other non-mental impairments. R. at 404, 412. Dr. Shipley assessed mild degrees of limitation for restrictions of

Mr. Patton's daily activities, social functioning, and ability to maintain concentration, persistence, or pace.  R. at 414.  Dr. Shipley found no episodes of decompensation of extended duration.  *Id.*  In his notes, Dr. Shipley wrote that Mr. Patton's claims are partially credible as the nature of his symptoms is supported by objective medical evidence; however, his claims about severity and functional limitations are unsupported by the medical record.  R. at 416.

On June 20, 2007, Dr. Beesley ordered a CT scan of Mr. Patton's lumbar spine.  R. at 418.  The results showed no fractures, dislocation, bulges, or herniation, but did indicate mild narrowing of the disc space "at the right side of L3-4 interspace."  *Id.*  On June 23, 2007, Dr. Larissa Dimitrov ("Dr. Dimitrov"), a physician at MedPlus Disability Evaluations, examined Mr. Patton and prepared an internal medicine report for the Disability Determination Bureau.  R. at 420.  Dr. Dimitrov found Mr. Patton's spine was tender to palpation, his gait was normal, he scored a 5/5 for grip and motor function in all extremities, his manipulative skills were normal, his range of motion was within normal limits, and he was alert, oriented, and able to follow simple and complex commands.  R. at 421-22.  Dr. Dimitrov concluded that despite his limitations, Mr. Patton is able to engage in activities for short periods of time, has no mental impairments, understands well, has a good memory, and can sustain concentration and persistence in social interaction.  R. at 422.

On July 10, 2007, Dr. D. Neal ("Dr. Neal"), a physician practicing in family medicine, evaluated Mr. Patton's physical residual functional capacity ("RFC").  R. at 423-30.  Dr. Neal determined that Mr. Patton is able to occasionally lift and carry twenty pounds; frequently lift and carry ten pounds; stand or walk a total of six hours in an eight-hour workday; and sit for a total of six hours in an eight-hour workday.  R. at 424.  Due to Mr. Patton's spinal fusion in 1993, he has a restricted range of motion in his lumbar spine and bilateral hips but is otherwise

within normal limits.  *Id.*  With respect to postural limitations, Dr. Neal established that Mr. Patton has the ability to frequently balance; occasionally climb ramps or stairs, stoop, kneel, crouch, and crawl; never climb ladders, ropes, or scaffolds.  R. at 425.  Dr. Neal also reported that Mr. Patton's manipulative skills and neurological examination were within normal limits.  R. at 424.  Like Dr. Shipley, Dr. Neal found Mr. Patton's claims were partially credible because the nature of the symptoms is supported by objective medical evidence, but Mr. Patton's assertions regarding the severity and intensity are unsubstantiated by the record.  R. at 428.

The only significant medical history in the Record from 2008 pertains to a visit to the Bloomington Hospital Emergency Department on October 23, 2008, where physicians treated Mr. Patton for a sprained ankle.  R. at 435.  Then, on June 4, 2009, Dr. Fink conducted a second mental status evaluation of Mr. Patton.  R. at 446.  Many of his notes and findings mirrored the first examination.  *See* R. at 402, 447.  Dr. Fink reported that Mr. Patton walked slowly, aided by the use of a cane, and exhibited discomfort when he seated himself.  *Id.*  Mr. Patton answered all of Dr. Fink's questions logically, but was also "hesitant and tremulous;" Dr. Fink noted no psychotic symptoms or suicidal thoughts.  *Id.*  During the interview, Mr. Patton reported feeling very stressed and depressed, reiterated his inability to golf or ride his motorbike, and stated that he only plays with his dog and rents movies.  *Id.*  Dr. Fink concluded that Mr. Patton's anxiety and depression-based symptoms "appear as a likely obstacle to effectiveness in the workplace," and he reduced Mr. Patton's GAF to 58 to reflect moderate difficulties with social and occupational functioning.  *Id.* at 447-48.  On June 8, 2009, Dr. Fink completed an evaluation of Mr. Patton's mental "Ability to do Work-Related Activities."  R. at 449-51.  Dr. Fink reported that Mr. Patton has "moderate limitations" in his ability to understand, remember, and carry out complex instructions; to make judgments about complex work-related matters; and to interact

appropriately with supervisors, coworkers, and the general public.  R. at 25, 449-50.  Dr. Fink found Mr. Patton has mild difficulties responding appropriately to usual work situations but has no limitations in understanding, remembering, and carrying out simple instructions, or with judgments regarding simple work-related decisions.  *Id.*

On June 30, 2009, Volunteers in Medicine[1] ("VIM") examined Mr. Patton for plantar fasciitis.[2]  R. at 454.  In addition to recommending exercises and seven-to-ten days off his feet, VIM prescribed medication and a brace to ease Mr. Patton's pain.  *Id.*  On July 23, 2009, Mr. Patton returned to VIM; the treating physician noted that Mr. Patton's gout was resolved, but he prescribed medication for gout and neuropathy.  R. at 453.

On November 9, 2009, VIM performed an Antinuclear Antibody ("ANA") screen[3]  on Mr. Patton's blood to test for the presence of lupus, the results of which were positive for lupus.  R. at 461.  A follow-up ANA screen on January 27, 2010, however, was negative.  R. at 483.  On February 2, 2010, a physician with VIM examined Mr. Patton and prescribed medicine for his neuropathy pain.  R. at 481.  On his clinical notes, the VIM physician documented depression, mood swings, rheumatology, and psychiatric findings.  R. at 481.  Also included in the report is a handwritten message: "Dr. Somers – 'You are a disabled body.'"  *Id.*

On February 5, 2010, on a referral from VIM, Mr. Patton was voluntarily admitted to a psychiatric hospital due to marked depression, suicidal thoughts, and auditory command

---

[1]Volunteers in Medicine is a volunteer clinic that serves the needs of residents in Monroe County, Indiana by providing primary and preventative healthcare and treatment to individuals who do not have health insurance and who are unable to afford private health care services.  *See* VOLUNTEERS IN MEDICINE OF MONROE CNTY., http://www.vimmonroecounty.org/ (last visited Nov. 14, 2012).

[2]Plantar fasciitis is an inflammation of the tissue located at the bottom of the foot, which causes sharp pain in the heel.  *See Plantar Fasciitis*, MAYO CLINIC (Mar. 15, 2011), http://www.mayoclinic.com/health/plantar-fasciitis/DS00508.

[3]An ANA test is used to identify the presence of an autoimmune disease, such as lupus.  *See ANA Test*, MAYO CLINIC (Aug. 31, 2011), http://www.mayoclinic.com/health/ana-test/MY00787.

hallucinations.  R. at 475, 479.  During an examination of Mr. Patton, the hospital physician noted decreased concentration and memory.  R. at 476.  Mr. Patton remained in the hospital for eleven days and was prescribed anti-depressants and pain medications.  R. at 25, 467-74.

**C.      The Administrative Hearing**

      **1.      Testimony of Mr. Patton**

At the Hearing, Mr. Patton testified about his previous work and impairments.  R. at 78.  While working for General Electric in 1992, Mr. Patton injured his back, and the injury flared-up through his work as a general contractor, which led to his filing for DIB.  R. at 78-79.  Because of his back pain, Mr. Patton has not worked since March 21, 2005, and he expressed that he is unable to perform any kind of work for eight hours each day of a five-day work week.  R. at 87, 94.  He stated he can only sit for ten to fifteen minutes before he must stand up, and his pain prevents him from sitting or standing for a full eight-hour workday.  *Id.*  Mr. Patton also has difficulties walking for any amount of time and distance, and he keeps his feet propped up to deal with the constant pain, but noted that doctors were able to get his swelling problems under control to an extent.  R. at 88-89.  Mr. Patton's doctors have prescribed medication to treat his neuropathy, as well as his high blood pressure.  R. at 89-91, 93.  Mr. Patton also described pain and cramping in his elbow, which prevents him from gripping anything in his hands, but because he is not working and using these joints, the doctors are not treating this ailment.  R. at 92-93.

      **2.      Testimony of the Medical Experts**

            a.      <u>Testimony of Dr. Karl Manders</u>

Dr. Karl L. Manders ("Dr. Manders") is a board-certified neurological surgeon, who also specializes in pain medicine.  R. at 78, 141.  Dr. Manders explained that after a back injury in 1993, Mr. Patton had a spinal fusion and has experienced lumbar pain ever since.  R. at 80-81.

While there is a limited range of motion in Mr. Patton's lumbar spine, Dr. Manders stated that Mr. Patton's motor power is intact in both his lower and upper extremities, there is no neurological deficit, and no evidence of nerve recompression or sensory reflex changes.  R. at 81.  Accordingly, Dr. Manders explained that Mr. Patton's spinal injuries did not meet or equal the Listings at 1.04 or 1.04A contained in 20 C.F.R. Part 404, Subpart P, Appendix 1 of the regulations ("Appendix 1").[4]  *Id.*

Dr. Manders reiterated that, based on Mr. Patton's RFC, he is able to frequently lift ten pounds and occasionally lift twenty pounds, but stated he would be concerned about any additional, repetitively heavy work.  R. at 82.  Dr. Manders noted that Mr. Patton has no environmental constraints and can sit or stand/walk six hours in an eight-hour day.  *Id.*  Dr. Manders agreed that the sitting duration assessed in the RFC is appropriate as long as Mr. Patton is able to periodically stand up, stretch, and move around to ease his back pain.  R. at 82-83.  Based on his review of the record, Dr. Manders found nothing that would require Mr. Patton to take unscheduled breaks each morning and afternoon.  R. at 84.

b.     Testimony of Dr. Donald Olive:

Dr. Donald A. Olive ("Dr. Olive") is a licensed clinical psychologist who specializes in forensic psychology and neuropsychology.  R. at 78, 142.  At the Hearing, he testified about his review of the evidence concerning Mr. Patton's mental impairments.  R. at 85.  Referring to the examination conducted by Dr. Fink on June 6, 2007, Dr. Olive testified that Mr. Patton has normal cognitive and social functioning abilities, a low-average level of intellect, and no psychotic signs, although he had been diagnosed with chronic, severe alcohol dependence and an unspecified anxiety disorder.  *Id.*  Dr. Olive also stated that any of Mr. Patton's limitations "in

---

[4]20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526 (West 2012).

activities of daily living were physically mediated in terms of his pain." *Id.* Dr. Olive referred to Dr. Fink's follow-up examination of Mr. Patton in 2009, which revealed increased levels of pain, decreased levels of daily activities, and a diagnosis of major depressive disorder (with his alcohol dependence in remission). R. at 85-86. Noting the limitations in work-effectiveness arising from Mr. Patton's depression and anxiety, Dr. Olive affirmed Dr. Shipley's (state psychiatric review of Dr. Fink's examination) finding that Mr. Patton's mental limitations are non-severe. R. at 86.

###### 3.      Testimony of the Vocational Expert

Robert Barber, a certified rehabilitation counselor, testified at the Hearing as the Vocational Expert ("VE-1"). R. at 94. The VE-1 explained that Mr. Patton's work as a general contractor was qualified as light, skilled work. R. at 95. The ALJ presented the VE-1 with a hypothetical scenario of an employee having Mr. Patton's educational and work experience, but who was restricted to employment consisting of light, sedentary work with an option to sit or stand as needed. R. at 96. The VE-1 explained that the computing, calculating, general business knowledge, and communication skills of a general contractor would transfer to sedentary positions, including a scheduling clerk (1,660 positions in region), telemarketer (2,130 positions in region), or timekeeper (1,225 positions in region), all of which are semi-skilled work. R. at 96-97. Mr. Patton's attorney posed an additional restriction for the VE-1, limiting the employment to positions where there is no repeated reaching, feeling, and handling with the upper extremities for two-thirds of the workday. R. at 97-98. The VE-1 responded that none of the positions he previously described would satisfy the new criteria. R. at 98. Mr. Patton's attorney also asked the VE-1 about the job prospects for an individual having the restrictions posed by the ALJ, in addition to having to elevate his legs for one-third of the day. *Id.* The VE-

9

1 stated that based on his experience (not according to the Dictionary of Occupational Titles), such a restriction would eliminate all types of employment.  *Id.*

**D.      The Second Administrative Hearing**

At the Second Hearing, Mr. Patton informed the ALJ that one day earlier, Dr. Somers, a physician at VIM, had explained to Mr. Patton that he is "a disabled body."  R. at 102; *see* R. at 481.  The ALJ stated that he did not want to make a decision without all of the evidence and informed Mr. Patton's attorney to obtain the medical records from VIM.  R. at 102-03.  Unable to make his final determination until the remaining evidence was submitted, the ALJ concluded the Second Hearing without hearing any testimony.  R. at 105-06.

**E.      The Third Administrative Hearing**

**        1.      Testimony of the Medical Experts**

                a.      <u>Testimony of Dr. William Kelley</u>

Dr. William Kelley ("Dr. Kelley") is a board-certified physician who practices in the area of family medicine.  R. at 37.  Dr. Kelley testified as a consulting medical expert for the Disability Determination Bureau regarding Mr. Patton's physical impairments.  R. at 38.  Dr. Kelley informed the ALJ that he had reviewed Mr. Patton's record, and in it he observed a history of low back pain, hypertension, former alcohol abuse, depression, and plantar fasciitis.  *Id.*  Dr. Kelley noted that none of the impairments in the record, or any combination thereof, medically equaled, for the requisite duration, any impairment listed in Appendix 1.  *Id.*

Dr. Kelley affirmed the RFC assessment contained in Mr. Patton's medical record that he was capable of performing light work, but he added a further limitation on Mr. Patton's ability to operate foot controls due to his plantar fasciitis.  R. at 38-39.  Dr. Kelley continued with his evaluation of Mr. Patton's RFC, noting restrictions for unprotected heights, hazardous

machinery, and also stated that Mr. Patton should be limited to only occasional bending, crouching, crawling, kneeling, squatting, stooping, and stair climbing.  R. at 39.  Mr. Patton had an unlimited ability in areas of fine and gross manipulation, but he should be fully restricted from climbing ladders, ropes, or scaffolds.  *Id.*  In Dr. Kelley's opinion, Mr. Patton could sit for six hours, stand or walk for a combined six hours, and stand in the workplace for five to fifteen minutes of each hour in an eight hour day.  *Id.*

Mr. Patton's counsel also questioned Dr. Kelley about Dr. Dimitrov's opinion from 2007, which reported that Mr. Patton was only capable of sitting for short periods of time.  R. at 39-40; *see* R. at 420-22.  Dr. Kelley stated that he considered Dr. Dimitrov's conclusion in making his determination that Mr. Patton was capable of sitting for six hours, and nothing in Mr. Patton's medical documents, such as an MRI, indicated that Mr. Patton's back pain would preclude him from sitting for longer periods of time.  R. at 40.  Lastly, Dr. Kelley noted that, in February of 2010, Mr. Patton had a blood work-up to ascertain the presence of lupus, but Dr. Kelley found no confirmation or diagnosis of this anywhere else in Mr. Patton's medical reports.  R. at 49-51.

b.      Testimony of Dr. Jack Thomas

Dr. Jack Thomas ("Dr. Thomas") is a board-certified clinical psychologist who testified at the Hearing as a consulting medical expert for the Disability Determination Bureau.  R. at 37-38.  After acknowledging that he had ample time to review Mr. Patton's medical records, Dr. Thomas stated there was evidence in the record of a mental impairment, noting Dr. Fink's diagnosis of chronic and severe alcohol dependence, accompanied by an unspecified anxiety disorder, as well as problems with tobacco dependence.  R. at 51-52.  Based on the GAF score of 65 assigned by Dr. Fink, Dr. Thomas characterized Mr. Patton's mental limitations as mild.  R. at 52.  Dr. Thomas also remarked that after the examination in 2009, Dr. Fink diagnosed Mr. Patton

with major depressive disorder and alcohol dependence in remission.  *Id*.  With a new GAF of 58, Mr. Patton's difficulties escalated to "the high moderate to mild range."  *Id.*

Dr. Thomas discussed an episode in 2010 where Mr. Patton was voluntarily hospitalized for approximately eleven days "due to severe stressors."  R. at 52-54.  Upon admission, Mr. Patton had a GAF of 15 and was characterized as depressed, suicidal, and having hallucinations. R. at 52.  Dr. Thomas stated that the medical records did not include Mr. Patton's discharge summary, condition at release, or any details regarding subsequent treatment; the only other information available was that Mr. Patton was discharged with prescriptions for anti-depressant and anti-psychotic medications.  R. at 52-53.  According to Dr. Thomas, outside of this incident, Mr. Patton's mental limitations have hovered in the mild-to-moderate range.  R. at 54.

Dr. Thomas stated that none of Mr. Patton's mental impairments, or combination of impairments, was the equivalent of any impairments listed in Appendix 1, but he did note that Mr. Patton is constrained by certain limitations.  R. at 54.  Based on a mental assessment of Mr. Patton's ability to do work (completed by Dr. Fink in 2009), Dr. Thomas testified that Mr. Patton is able to complete simple, repetitive tasks and some detailed tasks.  R. at 55.  Mr. Patton is also restricted to having only occasional contact with the general public, as well as his supervisors and co-workers.  *Id.*

### 2.      Testimony of Angela Patton

Angela Patton ("Mrs. Patton") testified that she and Mr. Patton were married in 2006, and since that time, she has observed him on a daily basis.  R. at 56-57.  Discussing his daily routine, Mrs. Patton stated that after Mr. Patton gets out of bed and is awake for a few hours, he goes back to sleep until four or five o'clock in the afternoon and then is "up and down, up and down"

throughout the evenings.  R. at 57.  Mrs. Patton explained that she takes care of all of the yard work and does not allow Mr. Patton to handle the bills because of his inability to concentrate.  *Id.*

Mrs. Patton stated that she did not believe Mr. Patton is capable of standing or walking for six hours of the day because he has spent approximately eighteen hours of each day in a recliner since at least 2006.  R. at 64-65.  She detailed some of the physical ailments afflicting Mr. Patton, dating back to even before they were married, which included three occasions where his back pain prevented him from getting out of bed.  R. at 57-58.  Six months into their marriage, Mr. Patton began having episodes every three or four days, during which he would have muscle spasms, and his feet would swell and become blotchy, red or purple, and very hot. R. at 58-60.  To alleviate the pain, Mrs. Patton rubbed his feet, or Mr. Patton soaked them and elevated his legs.  R. at 60-61.  Mrs. Patton also explained that there were mixed opinions about the basis of Mr. Patton's feet troubles—she testified that the emergency room called it a sprained ankle, and VIM believed it was gout and severe neuropathy.  R. at 61.  Mrs. Patton testified that after mixed results from two blood tests, Mr. Patton was scheduled for a third to confirm a diagnosis of lupus.  R. at 61-62.  Finally, Mrs. Patton added that before the couple recently moved to a one-story home, Mr. Patton used the handle of a broomstick as a makeshift cane in order to get around, but in their current house, he is able to walk from the garage to the house unassisted.  R. at 64.

According to Mrs. Patton, after Mr. Patton began experiencing the physical problems with his feet, his behavior also changed.  R. at 62.  In 2006, Dr. Beesley, treated Mr. Patton for depression.  R. at 65-66.  Mrs. Patton testified that Mr. Patton would cry daily and make suicidal statements, and she characterized him as "edgy" and "an emotional roller coaster."  R. at 62, 66.

### 3.     Testimony of the Second Vocational Expert

Constance Brown, a certified rehabilitation counselor and Vocational Expert (the "VE-2"), testified at the Third Hearing.  R. at 67.  She explained that Mr. Patton's past relevant work, from 1994 through 2004, included medium, semi-skilled work as a forklift operator and light, skilled work as a general contractor, noting, however, that Mr. Patton sometimes performed his work at a heavy level.[5]  *Id.*

The ALJ posed the following hypothetical for the VE-2 to consider:  An individual who is forty-five years old, having a high school education and the past relevant work experience of Mr. Patton, who is limited to performing light work as defined by the regulations; standing and walking no more than three hours each; occasional use of foot controls; complete abstention from unprotected heights, hazardous machinery, and climbing ladders, ropes, and scaffolds; occasional climbing of ramps or stairs, balancing, stooping, kneeling, crouching, and crawling; and an ability to stand at the workplace every hour.  R. at 67-68.  The ALJ also restricted the hypothetical to the performance of only simple, repetitive work, requiring no more than occasional interaction with the public, supervisors, and co-workers.  R. at 68.

Based on these constraints, the VE-2 stated that such an individual would not be able to perform the past relevant work of Mr. Patton.  *Id.*  The VE-2 explained that the hypothetical employee would be able to perform light, skilled, office-type work.[6]  *Id.*  She stated such positions would include a general office helper (3,300 positions in Mr. Patton's region), a mail clerk (not for the United States Postal Service ["USPS"], with 2,100 positions in the region), and

---

[5]The VE-2 also stated that Mr. Patton had previously engaged in assembly work, but she could not characterize the skill and exertion level because she did not know the type of assembly work he performed.  R. at 67.

[6]Instead of attempting to demarcate positions which allow an individual to stand for three hours and walk for three hours, the VE-2 based her answer on jobs where the employee would have a liberal sit/stand option and could choose how to split his time between sitting and standing.  R. at 68.

an office machine operator (1,300 positions in the region).  *Id.*  In response to the ALJ's question, the VE-2 explained that none of these jobs would be suitable for an individual who is absent two days out of each week.  R. at 69.

Mr. Patton's counsel presented additional limitations for the VE-2 to consider regarding the availability of jobs in the national economy.  R. at 69.  Based on the ALJ's hypothetical minus the two weekly absences, the VE-2 testified that an employee who must elevate his legs for half of each work day would be unable to perform any of the recommended jobs or any other sedentary work, and an individual who must take an additional, unscheduled break for one half of an hour each morning and afternoon would likewise be unable to maintain employment in the recommended jobs or in any other sedentary job.  R. at 69-70.

## II.   STANDARD OF REVIEW

This Court's review of the Commissioner's decision is "extremely limited."  *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008).  This Court does not determine whether Mr. Patton is actually disabled, but evaluates whether the Commissioner's finding "is supported by substantial evidence on the record as a whole."  *Bauzo v. Bowen*, 803 F.2d 917, 919 (7th Cir. 1986); *Lee v. Sullivan*, 988 F.2d 789, 792 (7th Cir. 1993).  The Court defers to the Commissioner's factual determinations that are supported by substantial evidence and does not reweigh any evidence, substitute its own judgment for that of the ALJ, or make credibility findings.  *See Schmidt v. Apfel*, 201 F.3d 970, 972 (7th Cir. 2000); *Brewer v. Chater*, 103 F.3d 1384, 1390 (7th Cir.1997).  Substantial evidence necessitates "more than a mere scintilla," but "requires no more than such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401-02 (1971); *Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 568 (7th Cir. 2003); *see Skinner v. Astrue,* 478 F.3d 836, 841 (7th Cir.2007) ("Substantial

evidence must be more than a scintilla but may be less than a preponderance."). The Social

Security Act enumerates a five-step analysis for determining whether an individual meets the

standard of disability necessary to receive DIB. *See* 20 C.F.R. § 404.1520(a), § 416.920(a). The

five steps must be considered in this order:

> (1) If the claimant is engaged in substantial gainful activity, he or she will be deemed not disabled.
>
> (2) If the claimant does not have a severe medically determinable physical or mental impairment, or combination of impairments, that meets the duration requirement in § 404.1509, he is not disabled.
>
> (3) If the claimant has an impairment(s) that meets or equals one of the impairments listed in Appendix 1 of this subpart and meets the duration requirement, he is disabled.
>
> (4) If, based on an assessment of the claimant's RFC, he or she can still perform his or her past relevant work, the claimant is not disabled.
>
> (5) If, considering the claimant's RFC, age, education, and experience, the claimant is able to make an adjustment and perform other work, the court will find the claimant is not disabled. If the claimant is unable to perform any other types of work, the claimant will be found disabled.

20 C.F.R. § 404.1520(a)(4). The Court must determine whether the Commissioner's conclusion,

as affirmed by the ALJ, that Mr. Patton was not disabled is supported by substantial evidence. In

order to be eligible for DIB, a claimant must be unable "to engage in any substantial gainful

activity by reason of any medically determinable physical or mental impairment which can be

expected to result in death or which has lasted or can be expected to last for a continuous period

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

## III.  DISCUSSION

### A.    The ALJ's Findings

The ALJ conducted the five-step analysis and determined that Mr. Patton did not satisfy

the disability requirements at any point between the alleged onset date March 1, 2005 and June

30, 2010, the date Mr. Patton last met the insured status requirements.[7]  R. at 17, 29.  The ALJ established that Mr. Patton was "defined as a younger individual" on the last-insured date, that he has a high school education and can communicate in English, and that, in this case, the transferability of job skills is not material to the determination of disability.  R. at 28.

At Step 1, the ALJ concluded that Mr. Patton had not engaged in any "substantial gainful activity during the period from his alleged onset date . . . through his date last insured."  R. at 17.  Then, at Step 2, the ALJ determined Mr. Patton has several severe impairments, which "represent more than a slight abnormality, and have more than a minimal effect on [Mr. Patton]'s ability to perform basic functional activities."  R. at 17-18.  The severe impairments include degenerative disc disease, status-post lumbar fusion at the L4-5 level, hypertension, plantar fasciitis, depression, and a history of alcohol abuse.  R. at 17.  The ALJ added systemic lupus erythematosus as a non-severe impairment as it would impose no more than a mild limitation on Mr. Patton's ability to perform basic work activities.  R. at 18.

At Step 3, the ALJ found Mr. Patton did not suffer from an impairment, or combination of impairments, that meets or medically equals an impairment listed in Appendix 1.  R. at 18.  In determining the severity of Mr. Patton's mental impairments, the ALJ concluded that Mr. Patton did not have "marked" limitations in at least two categories—including activities of daily living; social functioning; maintaining concentration, persistence, or pace; or repeated episodes of decompensation.  R. at 19.  Instead, Mr. Patton was assessed with mild restrictions in activities of daily living; moderate difficulties with social functioning; moderate troubles with concentration, persistence, or pace; and only one episode of decompensation during the disability period.  R. at 19-20.

---

[7]Mr. Patton was subsequently found to be disabled as of August 4, 2010 in his claim for Supplemental Security Income. (Dkt. 25 at 6.)

The ALJ next assessed Mr. Patton's RFC and concluded that Mr. Patton has the ability to:  lift and carry twenty pounds occasionally and ten pounds frequently; stand and walk for three hours, standing at the workplace for one hour; occasionally use bilateral lower extremities to operate foot controls; occasionally balance, bend, stoop, kneel, squat, crouch, crawl, climb ramps and stairs; and never climb ladders, ropes, or scaffolds.  R. at 20-21.  The ALJ added that Mr. Patton should avoid work at unprotected heights or around hazardous machinery and is limited to simple, repetitive work that does not require more than occasional contact with supervisors, coworkers, or the general public.  R. at 21.

At Step 4, the ALJ determined that, according to the VE-2's opinion, Mr. Patton would be unable to return to his previous jobs as a forklift operator and general contractor because the job skills "exceed[ ] the restrictions contained within the [RFC] capacity."  R. at 27-28.  Finally, at Step 5, the ALJ concluded that there are other jobs in significant numbers in the national economy which Mr. Patton is capable of performing.  R. at 28-29.  The VE-2 explained that based on Mr. Patton's age, education, work experience, and RFC, he could still perform light and unskilled work, including employment as an office helper; a non-USPS mail clerk; or an office machine operator.  R. at 28.  Thus, the ALJ determined that Mr. Patton was not disabled because he is capable of finding alternative, substantial and gainful employment and, as such, is not entitled to DIB.

**B.      Analysis**

Mr. Patton's sole argument for reversing the ALJ's finding for lack of substantial evidence is that "[n]either the ALJ's [RFC] assessment nor his hypothetical question to the [VE-2] upon which he relied accounted for" Mr. Patton's mental limitations with respect to maintaining concentration, persistence, or pace.  Dkt. 17 at 7.  In addressing Mr. Patton's

argument, this Court notes that the Seventh Circuit has previously found that an ALJ's failure to correctly assess the RFC may result "in the VE being given a flawed hypothetical," which would impact the ALJ's findings in Step Five of the analysis. *Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008); *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (explaining that the ALJ's hypothetical "must include all limitations supported by medical evidence in the record"). Accordingly, the Court will first review the ALJ's RFC analysis to determine whether it is supported by substantial evidence.

### 1.   The ALJ's RFC Analysis

Mr. Patton relies on the Seventh Circuit's decision in *O'Connor-Spinner v. Astrue*, 627 F.3d 614 (7th Cir. 2010), in his assertion that substantial evidence does not support the ALJ's RFC assessment of his difficulties with concentration, persistence, or pace.  Dkt. 17 at 6.  In *O'Connor-Spinner*, the Seventh Circuit explained that "such moderate difficulties normally should be reflected in" the RFC and corresponding hypotheticals to the VE.  *O'Connor-Spinner*, 627 F.3d at 620 (footnote omitted).

Before an ALJ performs the Step Four and Step Five analyses, he must, using all "relevant evidence in the record," assess the claimant's RFC.  *Young v. Barnhart*, 362 F.3d 995, 1000-01 (7th Cir. 2004) (citing *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); 20 C.F.R. § 404.1545(a)(1)) ("The RFC is an assessment of what work-related activities the claimant can perform despite her limitations.").   The RFC is an evaluation of the *most* an individual is able to do within her limitations, not the *least*, and it only considers the "functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms."  SSR 96-8p, 61 Fed. Reg. 34474 (July 2, 1996).   In order to determine the most an individual is capable of

doing, the ALJ must first ascertain whether there is an underlying physical or mental impairment(s) that can be evidenced by "medically acceptable clinical and laboratory diagnostic techniques," and that "could reasonably be expected to produce" the claimant's alleged pain and symptoms.  20 C.F.R. § 404.1529(a)-(c); R. at 22.  The ALJ next considers the extent to which the impairments limit the claimant's ability to function by evaluating "the intensity, persistence, and limiting effects of [the] symptoms."  20 C.F.R. § 404.1529(c)(1)-(4); R. at 22.

In this case, while the ALJ concluded that Mr. Patton's impairments could reasonably be expected to cause his symptoms, the ALJ ultimately concluded that Mr. Patton's "statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment."  R. at 17.  Because Mr. Patton argues only that the ALJ erred in his determination of Mr. Patton's difficulties with concentration, persistence, or pace, this Court will limit its review of the RFC analysis to Mr. Patton's mental limitations.  According to the ALJ, Mr. Patton's severe mental impairments included depression and a history of alcohol abuse.  *Id.*

The ALJ stated that he based the RFC evaluation on "the objective medical evidence and the testimony of the medical experts at the hearing."  R. at 21.  In determining Mr. Patton's RFC, the ALJ referred to Dr. Fink's examinations of Mr. Patton in 2007 and 2009, citing findings that Mr. Patton was alert and fully oriented, had intact memory functions, was able to compute simple arithmetic, exhibited no signs of unusual thought processes, and maintained logical and sequential speech (although hesitant and tremulous at times).  R. at 19-20.  It was the opinion of the medical expert that Mr. Patton "would have moderate restrictions with understanding, remembering, and carrying out complex instructions," but that "affectively and cognitively, [Mr. Patton] was capable of functioning in typical work environments and social settings."  R. at 20,

25.  The ALJ also specifically discussed Dr. Olive's and Dr. Thomas' concurrence in Dr. Fink's conclusions that Mr. Patton's mental impairments are non-severe, including Dr. Thomas' testimony "that he would limit [Mr. Patton] to simple and repetitive tasks with some detailed tasks, and occasional contact with supervisors, coworkers and the general public."  R. at 22-26. The ALJ stated:

> Taking this evidence together, [Mr. Patton] does have problems in this area, but it is clear from the evidence that they are not greater than moderate in degree.  Thus, no functional consequence of [Mr. Patton's] limitation in this area beyond an inability to sustain detailed or complex work processes . . . is found.

R. at 20.  The ALJ additionally found that Mr. Patton had not demonstrated that his moderate deficiency "represents a separate functional limitation, or one that is different in degree, from the restriction to simple, repetitive tasks."  *Id.*  Mr. Patton has not sufficiently demonstrated how the ALJ erred in determining Mr. Patton's RFC or in assessing his credibility with respect to the intensity, persistence, or limiting effects of his impairments.  Therefore, the Court finds that the ALJ sufficiently articulated the basis for his RFC assessment after citing the objective medical evidence and un-contradicted findings of the medical experts.[8]  Thus, the Court concludes that the ALJ's RFC assessment is supported by substantial evidence.

The Court will next consider whether the ALJ's determination at Step Five, that Mr. Patton is able to engage in other jobs existing in the national economy, is supported by substantial evidence based on the sufficiency of the hypothetical to the VE regarding Mr. Patton's moderate difficulties in concentration, persistence, or pace.

---

[8]In factoring Mrs. Patton's testimony into his RFC assessment, the ALJ explained that because her testimony was inconsistent with the rest of the evidence in the Record, it was not sufficient evidence to overcome the opinions of the psychologists that Mr. Patton was capable of working at the assessed level.  R. at 27, citing *Limberopoulos v. Shalala*, 17 F.3d 975, 979 (7th Cir. 1994)*; Cummins v. Schweiker*, 670 F.2d 81, 82-83 (7th Cir. 1982).

## 2.    The ALJ's Hypothetical to the VE-2

Mr. Patton argues that the ALJ violated the Seventh Circuit's holding in *O'Connor-Spinner*[9] because the hypothetical to the VE-2 contained a restriction only for "simple and repetitive work" and did not account for Mr. Patton's moderate difficulties with concentration, persistence, or pace.  Dkt. 17 at 6-7; R. at 68.  Before *O'Connor-Spinner*, the Seventh Circuit generally held that hypothetical questions to the VE "must include all limitations supported by medical evidence in the record." *Young v. Barnhart*, 362 F.3d 995, 1003 (7th Cir.2004) (citing *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002)).  In *Young,* the Seventh Circuit stated:

> It is important for the vocational expert to understand the full extent of the applicant's disability so that the expert does not declare the applicant capable of undertaking work in the national or local economy that the applicant cannot truly perform.  The hypothetical need not include every physical limitation, provided that the vocational expert had the opportunity to learn of the applicant's limitations through, for example, an independent review of the medical records or through other questioning at the hearing.

*Id.*  The *Young* court held the ALJ's hypothetical question to the VE ("simple, routine, repetitive, low stress work with limited contact with coworkers and limited contact with the public") was insufficient because it "failed to include all of the limitations supported by the medical evidence in the record from the other experts whose assessments the ALJ did credit."  *Id.* at 1004.

In *O'Connor-Spinner*, the claimant suffered from depression with suicidal thoughts, and a state agency psychologist concluded that her depression caused moderate limitations in areas of concentration, persistence, or pace.  627 F.3d at 617.  The ALJ incorporated this limitation into his RFC assessment, but during the hearing, the ALJ's hypothetical to the VE included only a restriction of "routine, repetitive tasks with simple instructions," and included no specific limitations for concentration, persistence, or pace.  *Id.* at 617-18.  The Seventh Circuit reversed

---

[9] At the time of the Third Hearing, the Seventh Circuit had not yet heard arguments in the *O'Connor-Spinner* case. The Seventh Circuit's ruling came down over four months after the ALJ issued his opinion regarding Mr. Patton.

the district court's ruling upholding the ALJ's decision because the ALJ's hypothetical must "orient the VE to the totality of a claimant's limitations," which, in that case, included a specific difficulty with concentration, persistence, or pace. *Id.* at 618-19. The court further stated that in "most cases, the ALJ should refer expressly to limitations on concentration, persistence and pace in the hypothetical in order to focus the VE's attention on these limitations." *Id.* at 620-21. Mr. Patton's reliance on *O'Connor-Spinner*, however, is misplaced because the instant matter is distinguishable from *O'Connor-Spinner*.

In *O'Connor-Spinner*, the Seventh Circuit stated that its holding "does not mandate the use of the specific terminology in every case." *Id.* at 619. The court distinguished cases where, for example, despite the ALJ's omission of the actual language of "concentration, persistence and pace" from the hypothetical, "it was manifest that the ALJ's alternative phrasing specifically excluded those tasks that someone with the claimant's limitations would be unable to perform." *Id.* To illustrate such an exception to the *O'Connor-Spinner* rule, the Seventh Circuit discussed *Johansen v. Barnhart*, 314 F.3d 283, 288-89 (7th Cir. 2002), explaining that the ALJ's hypothetical that included "repetitive, low-stress" employment was adequate because it "excluded positions likely to trigger symptoms of the panic disorder that lay at the root of the claimant's moderate limitations on concentration, persistence and pace." *O'Connor-Spinner*, 627 F.3d at 619. Mr. Patton's situation is more analogous to *Johansen* than to *O'Connor-Spinner*. Specifically, in this case, the ALJ determined that the source of Mr. Patton's moderate difficulties with concentration, persistence or pace was based on his "restrictions with understanding, remembering, and carrying out complex instructions." R. at 19-20 (relying on the evaluation and expert opinion of the consulting psychologist, Dr. Fink). As such, the Court finds that the ALJ's hypothetical of "simple, repetitive tasks" would exclude positions that involve any

complex instructions or tasks, as well as eliminate any risk of triggering Mr. Patton's moderate restrictions with concentration, persistence or pace.

Furthermore, Mr. Patton's argument that the ALJ violated the *O'Connor-Spinner* holding also fails because of the ALJ's reliance on the medical expert's RFC determination in formulating his hypothetical to the VE-2. In *O'Connor-Spinner*, the Seventh Circuit stated that, unlike in *Johansen*, it was unclear whether the ALJ's hypothetical provided the VE with sufficient information "to eliminate positions that would pose significant barriers" based on the claimant's limitations. 627 F.3d at 620. The ALJ had agreed with the RFC determination made by the state's medical expert "that there were at least moderate limitations [with concentration, persistence, and pace];" therefore, the ALJ should have included those limitations he found to have been present in his hypothetical to the VE. *Id.* In Mr. Patton's case, all of the psychology experts concurred in their opinions, and Dr. Thomas translated their objective medical findings into an RFC assessment (that Mr. Patton should be restricted to simple, repetitive work, requiring no more than occasional interaction with the public, supervisors, and co-workers), which the ALJ then adopted as his own RFC determination and incorporated into his hypothetical to the VE-2. R. at 54-55, 68; *see Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir. 1987) ("All that is required is that the hypothetical question be supported by the medical evidence in the record.").

By sufficiently including the mental limitations into his hypothetical, the ALJ was able to focus the VE's attention to those restrictions, which is similar to the ALJ's actions in *Johansen*. *See O'Connor-Spinner*, 620 F.3d at 620; *see also Milliken v. Astrue*, 397 Fed. App'x 218, 221-22 (7th Cir. 2010) (holding the ALJ's hypothetical question to the VE sufficiently accounted for the claimant's limitations in concentration, persistence, or pace because the ALJ had "incorporated [the medical expert]'s assessment that given [the claimant's] mental limitations, she could still

24

perform unskilled work"); *Johansen*, 314 F.3d at 288-89 (stating that it was reasonable for the ALJ to formulate his hypothetical based on the opinion of the medical expert, who had "translated those findings into a specific RFC assessment"). Accordingly, the Court concludes that the ALJ adequately accounted for Mr. Patton's limitations in concentration, persistence, or pace in articulating his hypothetical to the VE-2.

## IV.  CONCLUSION

For the reasons set forth above, the final decision of the Commissioner of the Social Security Administration is **AFFIRMED**. Final judgment shall be entered accordingly.

SO ORDERED.

Date:  12/07/2012

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

DISTRIBUTION:

J. Frank Hanley, II
lauras@jfrankhanley.com

Thomas E. Kieper
UNITED STATES ATTORNEY'S OFFICE
tom.kieper@usdoj.gov